## FERREN *vs.* O'HARA.

When a contract is for the sale of goods, &c., on which work and labor is to be thereafter bestowed, in order to make and put it in the condition contemplated by the contract, it is not within the clause of the statute of frauds relating to the sale of goods, wares and merchadise, and which requires a memorandum in writing, unless there is delivery and acceptance, or earnest paid.

A parol agreement between the plaintiff and defendant, by which the former agreed to sell to the latter a quantity of malt to be thereafter manufactured by the plaintiff and delivered, from time to time, as wanted, and by which the defendant agreed to take such malt, and to pay a specified price therefor, on the delivery of each parcel, *held* to be not within the above clause of the statute of frauds. MORGAN, J., dissented.

The decision in *Donovan* v. *Willson*, (26 *Barb.* 138,) approved and followed.

APPEAL by the plaintiff from a judgment of nonsuit, ordered on the trial at the circuit, before Justice MORGAN without a jury.

The plaintiff alleged, in his complaint, that on or about the first day of March, 1860, at Syracuse, the plaintiff, at the request of the defendant, agreed to sell to said defend-

ant all the malt which the plaintiff then had, and all that he should make up to the first of November, 1860, at and for the price of 93½ cents per bushel of 32 pounds. That the defendant, in pursuance of such agreement, continued to receive and pay for such malt until about the first of July, 1860, when, the price of malt having fallen in market, he refused to recognize and fulfill his said agreement, and refused to accept, buy, receive or pay for any more malt of the plaintiff. That the plaintiff then had on hand 64,932 pounds of malt, which, at the contract price of 93½ cents per bushel of 32 pounds, would come to the price and sum of $1897.29, which the plaintiff, in consequence of the refusal of the defendant to accept, receive and pay for the same, was obliged to and did sell for the best price he could get for the same, to wit, 80 cents per bushel of 34 pounds, amounting to the sum of $1527.81, leaving a deficiency of the sum of $369.48, which he claimed the defendant was bound and ought to make good to him, the plaintiff. The plaintiff charged and averred that by reason of the said defendant refusing to carry out and perform his said contract, he had lost the sum of $369.48, and had sustained damages to that amount, and demanded judgment against the defendant for the said sum of $369.48, with interest and costs.

The answer was, 1st. A general denial; 2d. Admitted that the defendant bought some malt of the plaintiff during the summer of 1860, and he would have continued to purchase malt of him if it had been of the same quality as that before purchased of and recommended by said plaintiff. But that the last hundred bushels purchased of the plaintiff was worthless, and the defendant by using the same sustained damage to the amount of $100, which he claimed to set off against any demand which the plaintiff might have against the defendant, and demanded judgment in his favor for that amount. 3d. A denial that the defendant ever made any contract either by himself or

his agent to take or receive from the plaintiff any given amount of malt, at any price or for any given time, only as the defendant bought from time to time as he wanted to use the same. And the defendant alleged that he had paid said plaintiff for all malt he had bought of him, &c.

On the trial, the plaintiff, to prove his cause of action, offered himself as a witness, and being sworn, testified: "That on or about the last of February 1860, he made a contract with the defendant, to sell him a quantity of malt. Defendant wanted to take malt on the same terms that McKechnie had it. · The defendant was a brewer, and carried on the city brewery. He bought out Andrew McKechnie, and commenced brewing the latter part of February or first of March, 1860. The plaintiff agreed to furnish the defendant with malt on the same terms he had furnished it to McKechnie. There was a written contract for the sale of malt between the plaintiff and McKechnie. The plaintiff read the contract to the defendant, and told the defendant he would let him have malt on the contract the same as McKechnie had agreed; and the defendant said he would take it. Nothing was said about time. On the 28th of February he got a brewing, and subsequently to that he got malt, and on the 9th of July. He paid the contract price. I made more malt than the defendant required, and sold malt from time to time to Pinkerton and others, for 95 cents per bushel."

The contract between the plaintiff and McKechnie was here introduced and proven, and is in the words and figures following, viz.:

"Whereas, Andrew McKechnie, of Syracuse, proposes to conduct the brewery business in the Syracuse City Brewery, situate on the corner of Mulberry and Cedar streets in said city, and is skilled in the malting business, and whereas Charles F. G. Ferren, of the same place, proposes to carry on the malting business, and is not thoroughly acquainted therewith; now this agreement be-

tween the said parties witnesseth: That in consideration of the premises and of the covenants and agreements hereinafter contained, the said McKechnie agrees to hire and rent to, and the said Ferren to use and occupy for the period of one year from the date of this agreement, the malt house and kiln connected with the said Syracuse City Brewery, together with such tubs, fixtures and implements, and so much room for storing grain and malt as may be required in carrying on the malting business in said premises; also the use of the horse and wagon and sleighs, in and about the business, as wanted. The said Ferren is to pay the said McKechnie the sum of two hundred dollars for the said premises and privileges, and the said McKechnie to superintend the malting of the grain. And it is further understood and agreed that the said McKechnie shall buy of the said Ferren all the malt he may use in his brewery business, at a price twenty-five cents per bushel above the average cost of the grain out of which it is made, and the said Ferren is, to sell to the said McKechnie such malt at the price above stated, payable on the delivery of each parcel thereof. And it is further understood and agreed that the said McKechnie is to pay all the taxes on said premises, and furnish all the water and gas that may be required to carry on the business of malting with convenience, without any additional charge or expense to the said Ferren, beyond the two hundred dollars before mentioned.

In witness whereof, our hands, at Syracuse, this first day of November, 1859.

A. McKechnie,<br>Chas. F. G. Ferren."

The witness further testified: " That the average cost of barley for the years 1859 and 1860, was 68½ cents per bushel, making the cost of the malt 93½ cents per bushel. The agreement between me and the defendant was

made the last of February or the fore part of March. The fore part of March I went to the brewery and saw two of Pinkerton's teams standing there waiting for malt. One of the teamsters, Mr. Fraser, said to me in the presence of Mr. O'Hara, that Mr. O'Hara said that Mr. Pinkerton could not get any more malt. I then turned to Mr. O'Hara and asked him if that was so. He said yes ; that he wanted all the malt I made, and more too. McKechnie, O Hara, Frazer, Hogan and Thomas Holloway, my maltster, were present. The market price of malt at that time was 95 cents per bushel. O'Hara continued to take the malt of me until July 9th. McKechnie took charge of the brewery. I sent the teams off without the malt, and continued to deliver the malt to the defendant, and refused to sell to any one else. He continued to receive the malt until the 9th of July, 1860. The defendant continued his brewing after that. He bought malt west, after that, as I understood. When I heard that the defendant bought malt west, I called on him and told him what I had heard ; and asked him if he was not going to take my malt. He said he thought not ; that McKechnie had told him it was not good. Soon after this I told him he had better take the malt. He said he should not. I told him if he did not I should put it in market and sell for the best price I could get, and look to him for the difference. The market price had fallen then below 93½ cents. I sold the malt October 17th, for 80 cents per bushel. That was about the market price of malt. The amount of malt on hand and manufactured, which I sold to Pinkerton, was 1909$\frac{22}{32}$ bushels, at 80 cents per bushel, from time to time between September 5th and October 11th. This malt was made under the direction of McKechnie. I called it good malt."

On his cross-examination, the witness testified : " This contract was executed at the time it bears date. The defendant bought out McKechnie, and commenced business,

about the 28th of February; on that day he had about 200 bushels of malt of me. The first conversation I had with O'Hara about assuming the McKechnie contract was the fore part of March 1860, in my office, no one present. I said to the defendant that McKechnie had told me that he, the defendant, would take the malt at the same price he, McKechnie, did, and on the same conditions. I read the contract to him, and he said he would take the malt on the same terms. A few days after this he had some more malt. It was some eight or ten days after this that I had the conversation with the defendant in presence of Pinkerton's teamsters. I had a lot of barley, about 600 bushels, that did not malt well, along the last of July or fore part of August. I asked him if he was going to take any more malt. He said no; that McKechnie said it was not good. That talk, I think, took place July 9th. I am not a maltster. I don't know the market price of malt through that summer and fall. I made a bargain with Pinkerton to sell him this malt for 80 cents."

The plaintiff, being recalled, testified that at the time he made the agreement with the defendant, he did not deliver the latter any malt. When the plaintiff rested, the defendant moved for a nonsuit on the following grounds:

1. There is no agreement to take malt for any specified time, or number of bushels.

2. There is no evidence, if such agreement existed, of damages by its breach.

3. There is no evidence the defendant used any, or how much malt, after the 9th of July.

4. The contract is void by the statute of frauds. (*a.*) If it is an agreement by the defendant to assume the written contract between McKechnie and the plaintiff, it is void, being an obligation to answer for the debt, default or miscarriage of a third person, and may not be performed within one year. (*b.*) If for the sale of malt, it is void,

being for the sale of property over $50, and no writing—
no consideration paid and no part delivered.

The said court thereupon reserved the question pre-
sented by the motion; and the defendant was called and
sworn in his own behalf, and other witnesses were ex-
amined.

. . The testimony being closed, the judge nonsuited the
plaintiff on the grounds that the agreement between the
plaintiff and defendant was without consideration, and
that the undertaking was void under the statute of frauds.

*Davis & Leach*, for the appellant.

I. The court below erred in holding that the contract
between the plaintiff and defendant was within the stat-
ute of frauds. 1. It was not, it is true, a written con-
tract; neither was it required to be, to render it legal.
2. It was not the promise to pay the debt, or to answer
the default of a third person. 3. It was a contract for the
sale and delivery of malt on hand and malt to be manu-
factured and delivered during the period from February
1859 to November 1859, and was therefore to be per-
formed within a year. 4. Although it related to the sale
of personal property exceeding $50, it was not invalid on
that account, because the buyer received a delivery of a
part of the property purchased. (2 *R. S.* 317, § 2, 4*th ed.*)
The statute does not require a concurrent delivery. A
subsequent acceptance of a part takes the case out of the
statute. (*McKnight* v. *Dunlop*, 5 *N. Y.* 537.) The case
shows the contract as of the last day of February, and on
the last day, the 28th, a part of the malt was delivered,
and deliveries of malt were received until the 9th day of
July, 1860.

II. The fact that there was a written contract between
McKechnie and Ferren for the sale, by Ferren to McKech-
nie, of the same malt covered by the contract between
Ferren and O'Hara, does not bring the case within the

second subdivision of section 2, above cited. 1. McKech-nie's agreement bound him to take what he should require in running his brewery. The contract terminated, then, when he required no more, and could use no more for that purpose. There was then no obligation of a third person for O'Hara to assume, and his promise to receive and pay for the malt he should use in running the brewery on his part, was an independent and original promise to pay his own obligation voluntarily made for his own benefit. Moreover, he receives immediately a part of the malt thus contracted for upon the contract. The contract between McKechnie and Ferren was read to O'Hara, as exhibiting the conditions on which Ferren would manufacture and sell malt to O'Hara. Ferren agreed to manufacture and sell, and O'Hara agreed to buy, on these terms, and both parties understood that the arrangement covered the season so far as O'Hara desired to use, and O'Hara subsequently demanded all the malt Ferren should make, and Ferren assented to it by repeated deliveries. 2. If the agreement with McKechnie had been a valid agreement for the entire year, it was competent for the parties to release it by parol, or by their own acts, although it was not in writing. (*Allen* v. *Devlin,* 6 *Barb.* 1.) The arrangement made by the three parties shows a clear intent to release both McKechnie and Ferren from any supposed obligations of their written agreement of November 1, 1859. McKechnie leases his brewery in which the malt contracted for was to be used. O'Hara agrees to buy the malt of Ferren on the terms stated in the writing, and in consideration of O'Hara's agreement Ferren terminates his contract with McKechnie for the parol agreement of O'Hara, and at once, acting on its mutual abandonment, delivers the malt to O'Hara. The acts would mutually estop McKechnie and O'Hara from insisting on the agreement.

III. The case shows what contract O'Hara made, and

his interpretation of the understanding or agreement with Ferren. About the 1st of March, and after some of the deliveries by Ferren, O'Hara insists that his contract covers all the malt which Ferren should make that season, and forbids him to sell to any body else, and Ferren assents to his construction—refuses those who were wanting to receive it—delivers all he makes to O'Hara, who receives under this contract, to the 9th of July, and then makes payment upon the contract. It is clear that this is not McKechnie's contract, in anywise. It was his own contract, without the intervention of third parties. A part of the property sold under it was delivered to and received by O'Hara, and there is no feature of the whole arrangement which is in conflict with the statute of frauds.

IV. Independently of the first agreement, the plaintiff was entitled to maintain his action under the agreement of March, for all the malt to be made, There was an agreement to manufacture. Ferren was to put labor on the material; and such an agreement never was within the statute. (*See Sewall* v. *Fitch,* 8 *Cowen,* 215; *Crookshank* v. *Burrell,* 18 *John.* 58.)

*G. N. Kennedy,* for the respondent.

I. There is no evidence of an agreement between the parties by which the defendant undertook or agreed to purchase, of the plaintiff, any specific quantity of malt, or to take malt of him for any specified time. 1. The written agreement between McKechnie and Ferren provides that McKechnie shall buy of Ferren all the malt he may use in his brewing business, at the price of 25 cents per bushel above the average cost of the barley of which it is made. 2. The alleged agreement with the defendant is, in part, as follows: " The plaintiff read the contract to the defendant, and told him he would let him have malt on the contract the same as McKechnie had agreed, and the de-

fendant said he would take it. Nothing was said about time." Again, the plaintiff testifies : "The first conversation I had with O'Hara about assuming the McKechnie contract was the fore part of March, 1860, in my office. No one present. I said to the defendant that McKechnie had told me that he, the defendant, would take malt at the same price he, McKechnie, did, and on the same conditions. I read the contract to him, and he said he would take the malt on the same terms." This agreement, at most, is only an agreement to pay the price that McKechnie had agreed to pay, for so much malt as the defendant might purchase of the plaintiff; and whether void by the statute of frauds or not, no action can be maintained against the defendant for not taking any specified quantity of malt under it. And as this is an objection fatal to the case, and which cannot be obviated by the plaintiff on a new trial, the court should, upon this ground, affirm the judgment. (*Horton* v. *Hendershot,* 1 *Hill,* 118. *Elsey* v. *Metcalf,* 1 *Denio,* 323.)

II. If this is held to be a contract to perform the written agreement between the plaintiff and McKechnie, then it is void as being an undertaking on the part of the defendant to answer for the default or debt of a third person.

III. If it be held an original undertaking of the defendant to purchase malt of the plaintiff, and is continuing in its effect, then it is void as being an agreement to purchase property to the value of $50 or more, as nothing was paid, no part of the property delivered, and no memorandum in writing.

IV. This agreement, if any, was to take malt in parcels along from time to time as the defendant should want it. Several parcels were delivered, and the price paid therefor on delivery. Such delivery did not take the agreement out of statute. (*Seymour* v. *Davis,* 2 *Sandf.* 239.) The case cited also holds this to be an agreement for the sale of merchandise, and not one for work and labor. What

difference is there between buying barley and malting it for market, or cider, and refining it for market? In each case the thing sold actually existed in solids, and the work done on it to fit it for market did not change the character of the contract.

*By the Court,* MULLIN, J.   If the contract set out in the complaint in this case is void by the statute of frauds, it is by virtue of that clause of it relating to the sale of goods, wares and merchandise, and which requires a memorandum in writing, unless there is delivery and acceptance, or earnest paid. It was decided in *Clayton* v. *Andrews,* (4 *Burr.* 2101,) that an agreement to sell and deliver to the plaintiff one load and a half of wheat within three or four weeks, to be paid for on delivery, was valid. The wheat was understood by the parties to be unthreshed, and it was held the agreement was not within the statute. That was an executory agreement, and the statute applied only to executed contracts. The court refer to *Towners* v. *Osborn,* (1 *Strange,* 506,) as decisive of the question. This was the rule as it was adopted by the courts of this State.

The English courts have repudiated the doctrine of *Clayton* v. *Andrews;* holding that executory as well as executed contracts are within the statute. (2 *H. Black.* 63.) But did not entirely repudiate the principle of the decision, so far as it held that contracts were not within the statute when work and labor was to be bestowed on the property sold in order to put it in a condition to satisfy the contract. There was a want of harmony in the English cases on this subject, which was got rid of by Lord Tenterden's act, as it was called. (9 *Geo.* 4th, *ch.* 14, § 7.)   That act provided that it should extend to all contracts for the sale of goods of the value of £10 sterling and upwards, notwithstanding the goods may be intended to be delivered at some future time, or may not, at the time of such contract, be actually made, procured or provided, or fit or ready for delivery,

or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery. The English cases since this statute are, of course, no authority with us, and we must look to our cases for authoritative constructions of the provisions of the statute under consideration.

*Parsons,* in his excellent work on *Contracts, (vol. 2, p. 334,)* draws from the English as well as the American cases, the following rules : 1st. That a pure executory contract for the sale of goods, &c., is as much within the statute as a contract of present sale. 2d. A contract for an article not now the seller's, or not existing, and which must therefore be bought before it can be delivered, will also be within the statute if it may be procured by the seller by purchase from any one, or manufactured by himself at his choice, the bargain being in substance as well as form, only that the seller shall, on a certain day, deliver certain articles. 3d. But if the contract states or implies that the thing is to be made by the seller, and also blends together the price of the thing, and compensation for work, labor, skill or material, so that they cannot be discriminated, it is not a contract of purchase and sale, but a contract of hiring and services, or a bargain by which one party undertakes to labor in a certain way for the other, who is thereupon to pay him compensation, and this contract is not therefore within the statute.

Were we at liberty to follow what seems to me to be the true rule on this subject, I should yield to the reasoning of the court in *Hight* v. *Ripley*, (19 *Maine,* 137,) in which many of the cases, both English and American, are reviewed, and it is shown that the foregoing rules are fairly deducible from them. But we are not, it seems to me, at liberty to dissent from the decisions of the courts of our own State. The question has been repeatedly before them, and they have with entire uniformity, I believe, held that when the contract is for the sale of goods,

Ferren *v.* O'Hara.

&c, on which work and labor is thereafter to be bestowed, in order to make and put it in the condition contemplated by the contract, it is not within the clause of the statute of frauds under consideration. In *Crookshank* v. *Burrell*, (18 *John.* 58,) the arrangement was to sell the wood work of a wagon. It was held not within the statute. The court repudiate the doctrine that executory contracts are not within the statute, but consider the agreement sued upon as a contract for work and labor. In *Sewall* v. *Fitch*, (8 *Cowen*, 215,) the contract was for nails, which were not all then manufactured; held not within the statute. These cases, and numerous others which might be cited, are clearly not within the statute, within any of the decisions; they are governed by the third rule of *Parsons*, above cited. But in the following cases the contract has been held not to be within the statute. In *Bronson* v. *Wiman*, (10 *Barb.* 406,) the contract was for so many barrels of flour, which were, I assume, thereafter to be either manufactured or purchased. Judge Gridley held it not to be within the statute. The question was not very distinctly up in the case, and it may not be binding upon us, but is entitled to our highest respect as the opinion of a distinguished lawyer and judge. This case is directly in conflict with *Downs* v. *Ross*, (23 *Wend.* 270.) That was an agreement for a quantity of wheat, part of which was in the granary and part unthreshed. In *Robertson* v. *Vaughn*, (5 *Sandf.* 1,) the agreement was for a quantity of shooks and heads for molasses hogsheads, which were thereafter to be made, and it was held not within the statute. *Donovan* v. *Willson*, (26 *Barb.* 138,) is on all fours with this case, and decisive of it. The agreement there was for beer thereafter to be made, and it was held by the general term of the 7th district not to be within the statute.

I can perceive no distinction in principle whether the subject matter of the contract is malt or beer; in each the material must be purchased. In each the raw material is

Ferren *v.* O'Hara.

transformed by labor and chemical changes into something different from itself. And I feel constrained to yield to this, although, as I have already remarked, I entertain great doubts whether the construction which takes these cases out of the statute is correct.

The malt and the beer, of as good a quality, might have been purchased in the market and delivered in performance of these contracts. It does not appear that the agreements were made with the manufacturers by reason of any particular skill which either possessed, or was supposed to possess, above others in the same branches of business; and unless this is the motive to the agreement, the contract is within the statute.

The objection was taken at the trial that there being no time limited within which the defendant was to purchase malt of the plaintiff, it was competent for him to stop at any time, and hence there could be no recovery. I have not examined this question, because the justice did not put the case upon that ground, and the plaintiff's counsel has not alluded to it in his points. It would be improper for us now to decide it.

I am, therefore, in favor of reversing the judgment, and ordering a new trial, costs to abide the event.

MORGAN, J., dissented.

New trial granted.

[OSWEGO GENERAL TERM, July 8, 1862. *Mullin, Morgan* and *Bacon,* Justices.]